IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2002

## GLENN A. SADDLER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Wilson County**
**No. 97-0230     J. O. Bond, Judge**

_____

**No. M2002-00597-CCA-R3-PC - Filed March 18, 2003**

_____

The petitioner was convicted of second degree murder and sentenced to imprisonment for twenty-five years as a Range I offender. Following an evidentiary hearing and the dismissal of his petition for post-conviction relief, the petitioner argues on appeal that prosecutorial misconduct and ineffective assistance at his trial merit a new trial. We affirm the post-conviction court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Harry A. Christensen and Henry Clay Barry, Lebanon, Tennessee, for the appellant, Glenn A. Saddler.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Robert N. Hibbett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The facts of this case were set out in the opinion of this court on direct appeal, affirming the conviction of the petitioner for second degree murder:

> In this case, a jury heard testimony that the victim had approached, the defendant put his hands on [him] and apparently demanded some money. Further, the jury heard the defendant testify that the victim was beating him and had a knife. So too, a knife was found on the scene, and the victim was bruised about the face. However, this same jury also heard testimony that the defendant was

angry and upset the night of the shooting, that the defendant had taken his shotgun with him that night, that the defendant had been drinking, that the knife found on the scene was unopened, that the defendant himself could not see whether the knife was open or not during the altercation, that the defendant had time to open his car and remove the shotgun before shooting the victim, that the defendant did not turn himself in to authorities at the scene, and finally that the defendant spontaneously admitted to another following the shooting, "I just shot a n____." Weighing all this evidence, the jury concluded that the conditions for "self-defense" had not been met.

State v. Glenn A. Saddler, No. M1999-00934-CCA-R3-CD, 2000 WL 924639, at *4 (Tenn. Crim. App. June 30, 2000), perm. to appeal denied (Tenn. 2001).

At the hearing on his petition for post-conviction relief, the petitioner proceeded on the claims that the State committed prosecutorial misconduct during his trial and his trial attorney was ineffective, presenting several witnesses in support of the latter claim. The petitioner did not testify at the hearing. These two claims are related in that one of the ways in which trial counsel was ineffective, according to the petitioner's analysis on appeal, was that he failed to object to the State's improper arguments, in addition to his failure to present at the trial certain witnesses to bolster the petitioner's claim of self-defense.

## ANALYSIS

### I. Prosecutorial Misconduct at Trial

Initially, in our review of the petitioner's claims, we note that, while specific references are made to the transcript of the trial in the petitioner's appellate brief setting out the allegedly improper arguments of the State, the transcript itself is not a part of the record on appeal, nor does it appear that it was presented to the post-conviction court to be relied upon in its ruling. Thus, the only information which we have as to the State's argument at trial is the excerpts, cited in the petitioner's brief, which he argues evidence prosecutorial misconduct. The general rule is that allegations, as these excerpts are, set out in an appellate brief are not evidence. See, e.g., State v. Keller, 813 S.W.2d 146, 150 n.4 (Tenn. Crim. App. 1991). Accordingly, the objected-to arguments of the State are not properly before this court. An additional problem as to the prosecutorial misconduct claim is that, although the petitioner's trial counsel was called by the petitioner as a witness at the hearing on the petition for post-conviction relief, counsel was not asked about the alleged improper arguments made by the State during the trial. In Davis v. State, 912 S.W.2d 689, 699-700 (Tenn. 1995), our supreme court considered a similar situation, concluding that the failure of a petitioner to explain why the basis whereby his pretrial statement should have been suppressed or to question, at the post-conviction hearing, trial counsel with regard to his claimed negligence in that regard constituted a waiver of the allegation:

The record shows the only "statement" made by the appellant consisted of a denial that he had known and worked for the victim and a failure to mention Homecrafters until the police mentioned it when asked where he had worked. [Trial counsel] filed a motion to suppress the statements, and at the suppression hearing, the trial court reserved a ruling on the matter until trial. The record does not indicate how the matter was dealt with by [second trial counsel] at trial, but apparently the trial court allowed the statements to be admitted. Appellant failed to question [second trial counsel] with regard to this issue nor has he indicated what would support suppression of the statements. He did state that he would get back to the issue at a later time in the cross- examination, but he never did. Appellant has failed to meet his burden of proving that [second trial counsel's] performance was ineffective. Additionally, he has failed to establish that the suppression would have affected the verdict, especially in light of the strong evidence against him. He has failed to establish a claim of ineffective assistance of counsel regarding this issue.

Accordingly, we conclude that, as to the claim of prosecutorial misconduct occurring during the State's closing argument, the petitioner has failed to prove his allegations by clear and convincing evidence, as required. However, even if this were not the case, we would conclude that the petitioner could not proceed on this claim because, not having been presented on direct appeal, it has been waived. As provided by Tennessee Code Annotated section 40-30-210(f) (1997), "[t]here is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived." See also Tenn. Code Ann. § 40-30-206(g) (1997); House v. State, 911 S.W.2d 705, 706 (Tenn. 1995), cert. denied, 517 U.S. 1193, 116 S. Ct. 1685, 134 L. Ed. 2d 787 (1996). No explanation was offered as to why this claim was not presented on direct appeal. See Tenn. Code Ann. § 40-30-204(e) (1997). Thus, the claim is waived.

## II. Ineffective Assistance of Counsel

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

-4-

The claims as to trial counsel are that he was ineffective both for failing to object to the State's improper closing argument and in not presenting witnesses to bolster the petitioner's theory of self-defense. As for the prosecutorial misconduct component of this claim, there is no proof in the record, as we have stated, of the State's closing argument, and the petitioner did not question his trial counsel about his conduct during the State's closing argument when he called counsel to testify at the post-conviction hearing. Accordingly, we conclude, as to this argument, that the petitioner failed to establish by clear and convincing evidence either that trial counsel performed deficiently or that he was prejudiced thereby.

The petitioner alleged, also, that trial counsel was ineffective for failing to present certain witnesses at the trial who would have bolstered his claim of self-defense. Testifying at the post-conviction hearing, in this regard, were Walter Stafford, Grady Wharton, Marie Seay, and Glenda Faye Nunnley.

Stafford testified as to an earlier incident between the victim and the petitioner, not specifying, however, when it occurred in relation to the murder. He said that the petitioner was living with him at the time, and that the victim, who apparently was owed five dollars by the petitioner, came into Stafford's house, "caught [the petitioner] in the back of the collar and pulled him out of the house and told him he was going to pay him his money this morning." Stafford objected to the victim's behavior, and the victim then left. Stafford did not see the victim with a weapon during the incident, and was not present when the petitioner killed the victim.

Grady Wharton said that he knew both the victim and the petitioner. According to his testimony, he saw, about a month before the crime, the victim push the petitioner against a wall and then pull a knife. Others present stopped the altercation, and Wharton did not know what had precipitated the trouble. He said that he was not present when the killing occurred.

Marie Seay also knew both the petitioner and the victim. She had once seen the victim slap the petitioner; and, on another occasion, the victim knocked on her door, looking for the petitioner. He asked the petitioner for money that was owed and, being told the petitioner had no money, "knocked him cold." The victim then "jumped" on the petitioner and "grabbed him by the throat." The petitioner came to and pulled out a pocketknife, which was closed, and the victim then grabbed the knife and told the petitioner he was going to cut his throat and kill him. Seay used a broom handle to knock the knife from the victim's hand, telling him to leave the house. The victim said that he would kill the petitioner if he saw him outside and threatened to "do something" to Seay if she did not return the knife to him. The victim then left her house. She said that this incident occurred "[w]eeks or months" before the crime. Seay did not see the victim with a weapon, other than the knife he took from the petitioner. She was not present when the petitioner killed the victim.

Glenda Faye Nunnley testified that she was the victim's first cousin. At the post-conviction hearing, she said that, from her house, she had seen the petitioner shoot the victim:

Well, it was about two o'clock, little after two Christmas morning. At the time I was living across the street from where the incident happened, 215 Owen Street. I had awakened from the couch and I got up, looking out the door and I heard people, loud voices. I didn't think anything of it at the time. The voices got a little louder and I was just looking down. At this time I saw that the car was running, and two people were coming from this car, was running. It was Robert Dean's car. The car that he was driving. And seemed to be an argument going on. Well they were so loud I just figured it was like an argument. And at that time I only saw two people. I didn't see [the petitioner] at the time because he was closer to the street. And the other two people I saw, I saw one person like going towards the person that I did see at the street which happened to have been [the petitioner]. And Travis Harris was in between [the petitioner] and Robert Dean and Robert Dean, at the time I didn't know it was Robert Dean but Robert Dean was going toward [the petitioner]. At that time I heard one shot, I didn't know if it was a gun shot, whether it was firecrackers or what that night, and I saw a person go down. Didn't know it was Robert Dean at the time. And I heard the voice of [the petitioner] saying, oh man what did you do that for? You done gone and made me shoot that man. Then the car the [the petitioner] got into went down Market Street. At that time, like I said I didn't know it was Robert Dean at the time, that had fallen and Travis went back over to the body, stood there for a couple of seconds, was looking like he didn't know what to do. Then he turned around and went into the house across the street.

She said that she had given a statement about this incident to the police, but she had not contacted the petitioner's trial counsel and had not known who was representing the petitioner at the trial. Because she was a relative, she had told the victim's family of what she had seen. She said that she had not seen the victim or petitioner grab the other, but she "just saw them standing there. One party was going towards another party. One party was standing in between these two people, and then [she] heard a shot." After the shot was fired, she heard the petitioner say, "[M]an, you've done gone and made me shoot that man."

During trial counsel's testimony at the hearing, post-conviction counsel asked him to explain why he had decided not to call "some six exculpatory witnesses sitting on the bench." Trial counsel replied:

I have no specific recollection. The best of my [re]collection though is that we listed a lot of witnesses, we subpoenaed a lot of witnesses, they were not eyewitnesses to the events itself [sic]. Only, as I recall Travis Harrison, I think, was the only actual eyewitness to

the offense. As to those other people it was my feeling based on my conversations, numerous conversations with [the petitioner] and based on my knowledge of the people, any discussion I would have had with them, some of them I think I talked to, others I may not have talked to, because as I recall during trial preparation [the petitioner] was supposed to have all the witnesses together at my office down on North Greenwood at the time one afternoon and he didn't make it with them. I think I probably talked to them during the course of the trial while we were up here, because we were up here several days. But it was my feeling that some of them came with baggage. The testimony that I could have gotten out of them could have helped, could have hurt, and at that point in time in the trial we felt comfortable with the proof that had gone in, the way the proof had gone in.

Frankly, . . ., we had hoped that [the petitioner] was going to make a better witness than he did. I mean, I've seen [the petitioner] stand up in court and make pleas that I wish I could have made. But he didn't do as well as we had hoped.

But as to why we didn't put those witnesses on that would have been tactic and strategy at that time based on what I felt their testimony would be, what we would have gained from the testimony and what we could have lost from the testimony. Because, of course, [the petitioner] came into court with quite [a] bit of baggage.

Trial counsel testified that, at trial, he had presented photographs of bruises on the petitioner's hands and face, caused by the victim, and described proof of self-defense which he had presented at the trial:

It's also my recollection that we put on a lot of proof about [the victim] coming to [the petitioner's] apartment at Northfield and beating on the doors and [the petitioner] being scared and calling the police. It's my recollection we had a number of policemen that testified. It's my recollection that we probably used the dispatch logs and that kind of thing to show the fear that he had. And then, of course, [the petitioner] testified how fearful he was about the attack that was being made. We put in a lot of proof about the knife that [the victim] had. Although at the scene the blade was actually closed, it was not open. But in my recollection it was a big old Hawk bill knife.

Trial counsel further explained on cross-examination why he had not called witnesses as to the troubled background between the petitioner and the victim:

> Q.    What would have been their purpose if you had called them or would they have had any purpose whatsoever?
>
> A.    The purpose would have been, I would presume, to show that [the petitioner] and [the victim] had had problems in the past and that [the victim] may have had a reputation for violence. Now, I checked [the victim's] record here in Wilson County and he did have one prior assault but that had been nolled. So we couldn't get into that. And, like I said earlier, with the witnesses, some of them came with baggage, some of them knew more about [the petitioner] than we would have cared for the jury to know. So, you know, it's a two edge sword. And with the proof the way it was at that time, I felt it was better tactically not to use them. To keep it as simple as we could and we put on a good self defense case.

At the conclusion of the hearing, the post-conviction court found as follows:

> Of course, the Court has heard what was stated and I think I understand it. I remember the trial. I remember a lot of the witnesses that, even though you know, it's been a long time ago, because I knew [the petitioner] here a long time in years back. And what [the prosecutor] did at the trial as far as prosecuting, the statements and arguments that he made were purely theories of what the state's theory is and they're allowed to give that. They're allowed to say that this evidence leads to this, or this evidence leads to that. And although it brings out an opinion based on maybe the argument of the proponent to the motion, it sounds like that person's opinion, actually it's an argument as to what the facts show. And what they believe those facts to show. And I don't believe [the prosecutor] did anything wrong in trying the case. I didn't see anything if I remember the case.
>
> I believe all the witness statements and everything were turned over to the defense in this case. I think it's open discovery, completely open on the part of the police department. I don't think Ms. Nunnley's statement was kept hidden anywhere. She was here, she'd been subpoenaed by the State of Tennessee to be here. She stayed during the whole time, and she's right, she was in a room and couldn't come in because she was a potential witness and witnesses can't hear what other people are going to say prior to their testimony.

That's the reason she couldn't come in. It wasn't trying to hide anything from her. The state chose not to use her in their case in chief. They didn't have to use her. They had put on other proof as to how it happened, and they were satisfied with that proof that that would be sufficient to prove what the allegations were.

Then the [petitioner] here he came on and testified, and I remember his testimony, I thought he did a very poor job, [h]e's usually good at it. He's one of the best talkers of any people I've ever met. He could have made a living being a public speaker because he was good at talking. Always has been. He's always been a nice guy, except like you say when he's drinking and this type thing, that makes a little difference in him some time. But he has had a history of coming in and out of courts for different things himself, so he wasn't unknown to the system. But he testified and the jury heard all of that, and they could have believed him or they could not have believed him. In this case they chose not to believe what he was saying as to how it actually happened. There was a lot of testimony about how he kept the gun coming out of his apartment up under his coat and he left and came back – a whole lot of testimony about the preparation of this right before the killing, what happened.

So, the jury had all of that, and the state and the defense attorney did a good job as far as painting the deceased as bad, that came out. He was indicated to be a bad character especially when he was drinking like Ms. Nunnley said. All of that came in. So, the jury just didn't accept the way it happened as being justified under the self defense law and that was charged to them.

The proof has to be here today – would something brought to light here today change the course of the trial and render a different verdict, is really what it boils down to. I don't see that it would have. [Trial counsel] testified that he thought he talked to every one, all the witnesses. He wasn't especially sure one way or the other now, but thought he would have, and did. Either talked to them at one place or the other, either during the course of the trial or prior to trial, and interviewed them.

The Court's going to deny the motion for relief.

Initially, we note the post-conviction court announced its findings at the conclusion of the hearing, and there are no written findings in the technical record. Following a post-conviction hearing, a trial court is required to enter written findings of fact and conclusions of law addressing

all grounds for relief.  See Tenn. Code Ann. § 40-30-211(b); Tenn. Sup. Ct. R. 28, § 9(A). Nevertheless, the trial court's oral pronouncement of its findings from the bench does not necessarily require reversal and can be harmless error.  See State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987).  Here, the post-conviction court's findings and conclusions are sufficiently comprehensive to allow for proper appellate review; hence, the failure to enter written findings and conclusions was harmless.  Tenn. R. App. P. 36(b).

At the hearing, the only proof presented as to dealings between the petitioner and trial counsel regarding relevant witnesses was the testimony of counsel that the petitioner did not appear at counsel's office with these witnesses, as he was supposed to do.  Counsel believed that, during the trial, he had talked to all relevant witnesses of whom he had been aware.  He said that he presented proof at trial as to the victim's aggressiveness towards the petitioner; of the petitioner's fear of the victim, the petitioner calling police for assistance when the victim had beaten on the petitioner's door; and of the victim's carrying a knife.  Thus, at least to an extent, and perhaps a great extent, the testimony of Stafford, Wharton, and Seay would appear to be very similar to testimony presented at trial on behalf of the petitioner.  As to his decision not to present certain unidentified witnesses, trial counsel said that they came with "baggage."  Thus, as a matter of strategy, he decided not to present these witnesses who were present at the trial.  Trial counsel was not asked if he had known of Glenda Faye Nunnley at the time of trial, although it seems likely that he did.  However, it appears that her testimony, that the victim was "going towards" the petitioner when the shot was fired, would have been of little assistance to the defense in light of other evidence which was presented.  In this regard, we agree with the post-conviction court that the petitioner failed to show that the testimony of any of these witnesses would have changed the outcome of the trial. Accordingly, we conclude that the record supports the post-conviction court's determination that the petitioner did not establish that he was prejudiced by any of the questioned actions of trial counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the order dismissing the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE